**UNITED STATES of America, Appellee,**

v.

**David G. SWAIM, Appellant.**

**No. 79–5202.**

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 18, 1980.

Decided March 5, 1981.

Rehearing Denied April 29, 1981.

Norman B. Smith, Greensboro, N. C. (Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., on brief), for appellant.

Benjamin H. White, Jr., Asst. U. S. Atty., Greensboro, N. C. (H. M. Michaux, Jr., U. S. Atty., Durham, N. C., Becky M. Strickland, Paralegal Specialist, on brief), for appellee.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

The defendant, the acting station manager and supervisor of the Hilltop Station Post Office in Greensboro, North Carolina, was convicted of five counts of filing false accounts with the United States Postal Service in violation of 18 U.S.C. § 2073. The defendant's indictment was occasioned by his alleged failure to report, on form 1412A, postage sales on August 4, 1978, September 12, 1978, October 2, 1978, December 1, 1978, and December 20, 1978, when it is alleged he in fact sold postage in the amounts of $210.00, $206.00, $210.00, $390.00, and $105.00. We grant a new trial.

The defendant's individual accountability forms, 1412–A, did not indicate any postage sales on the dates on which it is charged he filed false reports. Postal employees are required to file a form 1412–A to report all receipts and disbursements for each day on which they have made sales of postage. The information on the 1412–A form is included in the single form 1412–CX which reports the entire business of the station for a particular day.

On each of the five days that are in question in counts three through seven of the indictment, the daily deposit in the station's account at North Carolina National Bank contains a check in a larger than ordinary amount received from a customer in payment for postage. Edgar C. Butler purchased postage at the Hilltop Station on August 4 and October 2, 1978 with $210.00 checks and on December 20, 1978 with a $105.00 check. Henry V. Cashwell pur-

chased postage on behalf of the Tencarva Machinery Company with checks in the amounts of $206.00 on September 6, 1978 and $390.00 on December 1, 1978.

Through use of information garnered from the bank deposit records and employees, the 1412–A and 1412–CX forms for the days in question, and out of court interviews with the six postal clerks other than the defendant employed at the Hilltop Station, Postal Inspector Goodwin prepared charts summarizing the funds reported on the 1412–A form as remitted for deposit by the various window clerks on duty and the other receipts making up the station's daily deposit. The charts imply that the defendant, rather than one of the six window clerks, accepted the five checks in exchange for postage and that he failed to report the sales on his 1412–A form for the dates in question. The inference, of course, is that he stole an amount of cash equivalent to the value of the unreported checks. These five charts, Exhibits 35 through 39, and the Inspector's testimony explaining his method of preparing them form the bulwark of the government's proof concerning counts three through seven. The charts and Goodwin's testimony implicitly exonerate the six window clerks of any wrongdoing by unequivocal acceptance of the veracity of the clerks' out of court statements, leaving the defendant as responsible for any shortage.[1]

Neither form 1412–A nor 1412–CX analyzes the reported receipts into components of cash and checks. Inspector Goodwin had to establish that the five daily bank deposits contained an additional check not among the receipts reported on the window clerks' form 1412–A in order to prove that the defendant filed his 1412–A form omitting checks received in exchange for postage. Goodwin's objectionable testimony came in his ascertaining the respective amounts of cash and checks represented in the receipts recorded on the 1412–A form of each individual clerk on duty and on the 1412–CX for the station's receipts as a whole so as to

---

1. No shortage was proven except by the out of court statements of the window clerks. Two of

the clerks did incompletely testify at trial concerning the checks.

present circumstantial evidence that five additional checks, unreported on the 1412–A form, were included in the bank deposits. Goodwin obtained microfilm copies of the checks in the Hilltop Station bank deposits for the five days in question from the North Carolina National Bank. Standard procedure required an employee to initial the back of a check as he received it in payment for postage. Therefore, all the checks in the bank deposits, including the five checks that are the subject of these charges, should have borne someone's initials on the back. (See id.). The Inspector showed the microfilm copies of the checks to employees of the station. Each clerk identified which checks bore his initials and therefore had been received by him.

Informed by the window clerks' out of court identification of their initials, Goodwin allocated the checks among the clerks on duty on the five days in question. By simple subtraction he determined the respective values of the elements of cash and checks composing the receipts reported on the 1412–A of each clerk on duty on the five days at issue. Therefore, he also determined the elements of cash and checks in the receipts of the entire station for a given day. The charts compare these amounts, denominated "available for deposit," with the amount actually deposited. Such was the method employed by Goodwin showing the financial picture of the Hilltop Station for the five days that became the subject of counts three through seven of the indictment in this case.

Since in the instance of each of the five bank deposits none of the six window clerks identified the particular check in issue as received by himself or anyone else, the amount of checks available for deposit is less than the amount of checks actually in the bank deposit for that day by the exact amount of the unidentified, unallocated checks. Because the government's proof accepts as a verity that the 1412–A forms of the six window clerks are in order, it can suggest no other conclusion than that the defendant received and failed to report the five checks. The government seeks to sustain the conviction of the defendant solely on the failure of the window clerks in out of court interviews with Inspector Goodwin to identify the particular checks, and in the same interviews identifying their own.

Certain trial testimony refutes the accuracy of the conclusion the government seeks to draw. With regard to the customers who presented the five checks alleged to be unreported, Edgar C. Butler remembered that he had been served by the defendant over a three year period, but he could not recall, given the length of time, whether it was the defendant who had taken the checks in question. Henry V. Cashwell could not recall that the defendant had ever waited on him.

More importantly, a sample of the defendant's handwriting was taken by the postal inspectors. But the government did not present any expert handwriting testimony concerning the initials on the five unallocated checks. Postal inspectors also took a fingerprint sample from the defendant; nonetheless, the prosecution offered no testimony identifying the defendant's fingerprints on any of the five checks.

The trial testimony uncovered confusion regarding whether the presence of a clerk's initials on the back of a check meant that the particular clerk who had initialed the check had filled the customer's order or received the check. If a window clerk lacked the necessary stock to fill a customer's order, he might exchange the check for stock sufficient to fill the order. The result of this practice is that a sale may be reported on the form 1412–A of a clerk different from the one whose initials are on the check. Two of the clerks said that it was possible that they filled some of the orders paid for with the five unallocated checks. Clerk Ruff testified that she might confuse the initials of the defendant and clerk W. G. Swaim (no relation).

Testimony further indicated that others as well as the defendant had an apparent opportunity to remove cash from the bank deposit. The testimony of both the defendant and Goodwin showed that on three of the five days in question either of two

clerks other than the defendant mailed the bank deposit. On the other two occasions, either the defendant or one other clerk mailed the bank deposit. Finally, as the government's brief points out, clerk W. G. Swaim testified that any of the six clerks could have had access to the drawer where the cash and checks were remitted for the daily bank deposit.

There were six window clerks, W. G. Swaim, Keaton, Matthews, Stephens, Dalton, and Ruff. All testified at the trial. All testified that the five checks in question which make up the shortage did not bear their respective initials. Of these six window clerks who, together with the defendant, were the only ones shown to have had opportunity to commit the crimes only two were asked if they identified to the postal inspector their own initials on the checks deposited to the credit of the post office branch on the days in question. They testified that they did so identify their initials to the postal inspector, but even they did not say how many checks they identified for the inspector or identify any particular check. W. G. Swaim responded to a question directed to "various checks," and Stephens to a question using the words "a number of microfilm copies of checks." None of the six identified in court their initials on any single check, or even on a group of checks, and all of them except Stephens and W. G. Swaim were not even asked in court if they had identified their initials on any check to the postal inspector.

From all of the foregoing, two facts are abundantly clear. First, no shortage at all was proved without the hearsay statements of Keaton, Matthews, Dalton and Ruff. The identification of the defendant as the one responsible for the shortage and the false records even more tenuously depends on the same hearsay.

We base our opinion on the hearsay statements of Keaton, Matthews, Dalton and Ruff because W. G. Swaim and Stephens did testify that they had identified "some" or "a number of" checks for the postal inspector as bearing their initials, and even as to this, W. G. Swaim was not sure of all of those checks. It may be argued, although we do not decide, that such testimony of W. G. Swaim and Stephens made the postal inspector's critical evidence as to them harmless, and while it might be said that if the conviction depended on their testimony alone it would be shaky, we do not decide this or base our opinion on any default in their testimony in order to remove uncertainty from this opinion.

█ The three contentions of the defendant may be summarized as follows. First, the evidence does not support the verdict; second, the indictment is insufficient to charge a crime in that it did not identify the daily financial report as an official report of the postal service; and, third, the admissibility of the postal inspector's evidence. The first two contentions may be summarily disposed of. This is a proper case for us not to pass upon the sufficiency of the evidence, and we do not. *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979), overruled en banc on other grounds, 602 F.2d 653 (1979). We think the indictment sufficiently charges a crime. *United States v. Moore*, 512 F.2d 1255 (4th Cir. 1975).

█ Because there is a dissent, more discussion is appropriate on the hearsay question. The panel is agreed that the evidence is hearsay; it was a statement other than one made by the declarants while testifying at the trial offered in evidence to prove the truth of the matter asserted. FRE 801(c). That much is not the subject of argument. The defense attorney commenced his objection when he was cut off by the trial court as related by the dissent. But, after that point, with respect, we take issue with the dissenting judge.

█ Perhaps the attorney intended only to object on some ground with respect to the qualification of the witness or with respect to the information upon which the witness based his conclusion. But this is not shown by the record, and it is apparent from the record that other objection could

have been forthcoming. If any ground was apparent to all, it was the more fundamental ground that the evidence was hearsay. It is true that the trial court treated the objection as one to the information on which an expert witness based his opinion, but it was not so apparent either from the evidence or from the incomplete objection stated that this was the only objection which could have, might have, and ought to have been made at that time. If a trial court wishes to interrupt and rule on an incomplete objection while the attorney is stating the grounds for it, then we think, if there is more than one objection apparent, the defendant may raise on appeal the objections which were apparent at the time the objection was interrupted by the trial court. See *Federal Rules of Evidence Manual*, Redden and Saltzburg (1975), Editorial Explanatory Comment, p. 246, and 1979 Supplement, p. 16.

■ The issue of whether Goodwin was an expert witness was not raised at the trial. Although it may be that parts of Goodwin's testimony consisted of conclusions properly drawn by an expert, those parts are not in issue here, his critical testimony did not require any expert knowledge but only simple arithmetic to come by. Reduced to its fundamentals, he testified that since six of the seven people with access to the money had told him they handled certain checks which made up the bank deposits on the dates in question that the seventh person must be the one who purloined the money and falsified his record. The proper rule as to when a witness testifies as an expert is stated in VII *Wigmore on Evidence*, Chadbourn Revision (1978), § 1917, p. 10, as follows:

"... *wherever inferences and conclusions can be drawn by the jury as well as by the witness*, the witness is superfluous...." (Italics in original.)

Because the critical conclusions which Goodwin asked the jury to draw were as well drawn by them as by him, he did not testify as an expert in this respect.

Equally fundamental reasons for not considering Goodwin as an expert witness in order to approve the admission of his testimony are found in the government's brief as well as in the record. Nothing in the record shows that Goodwin was offered as an expert with respect to which people in the branch post office initialed the checks making up the bank deposits. In the government's brief filed in this court, the government not only concedes Goodwin did not testify as an expert with respect to the crucial facts in question here, it argues that he did not.

Brief p. 38. "The witness Goodwin *did not express his opinion* as to what the evidence was, but merely testified that the government exhibits 35 through 39 represented a summary of the information found in government exhibits 35–B through 39–B and the microfilm copies of checks deposited in the station's bank deposits for the dates in question." (Italics added.)

Brief p. 38 (continuing). "In this case, the charts (government exhibits 35 through 39) are straightforward in their basis and the evidence is clear. They are not replete with characterizations and conclusions nor are they deceptive. *The charts do not contain complicated calculations requiring expert testimony to show their accuracy.*" (Italics added.)

■ Because Goodwin did not testify as an expert with relation to the facts in question here, his hearsay testimony of the out of court statements of the window clerks was inadmissible hearsay under FRE 802, and government exhibits 35 through 39 were inadmissible. The government argues that admitting the evidence is nevertheless harmless error. We do not think so. It went to the very heart of the government's case. It does not suffice to say that the window clerks were available for examination by the defendant on whether or not their initials were on the checks making up the bank deposits. The burden was on the government to prove this, and it did not by admissible testimony.

Accordingly, the judgment of the district court is vacated and the case is remanded for a new trial.[2]

*VACATED AND REMANDED.*

DONALD RUSSELL, Circuit Judge, dissenting:

The majority concludes the conviction must be reversed because of the admission in evidence of certain exhibits prepared by a postal inspector, reconstructing the records of receipts and bank deposits of all the employees at the postal substation for the five relevant days. When this exhibit was offered the defendant began an objection but the District Court, without making a ruling at the time, stated the defendant would have an opportunity to cross-examine. In effect, the District Court was following the practice suggested by Rule 705, Federal Rules of Evidence. This Rule contemplates that an expert witness may give his opinion, which, assuming the witness was an expert witness, will be permitted, reserving a final ruling on the admissibility of the opinion after cross-examination during which the defendant would be expected to develop his line of objection to the opinion or, as in this case, an opinion expressed in the form of an exhibit. This was what the District Court did in this case, assuming as it did that the witness was an expert witness within the contemplation of an expert witness as defined in Rule 702 of the Federal Rules of Evidence. It is, of course, true that this procedure permits the opinion to be before the jury, even though it might later be ruled, after cross-examination, that the opinion of the expert was for some reason inadmissible. This was understood by the drafters of the Rule but, as they stated in their Advisory Notes, it was not regarded as a reason for not following the procedure contemplated under the new Rule. *See* Saltzburg & Redden, *Federal Rules of Evidence Manual*, 442 (2d Ed.1977).

The critical question, as I view it then, was whether the postal inspector qualified as an expert witness under Rule 702. That Rule, in defining expert witnesses, did not adopt any narrow or crabbed construction of the term, but included within its intendment any witness who, by training and experience, can, by his opinion, be helpful to the jury in resolving the issues. *United States v. Johnson*, (5th Cir. 1978) 575 F.2d 1347; *United States v. Collins*, (9th Cir. 1977) 559 F.2d 561; *Soo Line R. Co. v. Fruehauf Corp.*, (8th Cir. 1977) 547 F.2d 1365. This witness met that test. He had prepared an opinion requiring special training in reconstructing bank records. That was sufficient to bring him within the definition of an expert witness. After qualifying as an expert witness, the postal inspector was entitled to give his opinion, which, in this case, was represented by the challenged exhibits, and this would be true even though in part his opinion may have been based on evidence which was not in evidence, provided only that the opinion is based on information normally relied on by an expert witness in reaching an opinion in such a case. The procedure used by the postal inspector in developing his exhibits, expressive of his opinion, accords with normal accounting practice in the context of this case. This is the procedure expressly authorized in Rule 703, Federal Rules of Evidence. *United States v. Genser*, (3d Cir. 1978) 582 F.2d 292; *United States v. Golden*, (9th Cir. 1976) 532 F.2d 1244; *United States v. Morrison*, (1st Cir. 1976) 531 F.2d 1089; *cf., however, United States v. Brown*, (5th Cir. 1977) 548 F.2d 1194. And this is particularly so when all the data on which the opinion was based, may be tested and inquired into on cross-examination. *Scholz Homes, Inc. v. Wallace*, (10th Cir. 1979) 590 F.2d 860.

Measured by these rules, the exhibits here were manifestly admissible under the Federal Rules of Evidence. They represented the ultimate opinion of an expert who, as we have said, demonstrated by his training and experience his ability to recon-

---

**2.** We do not take issue with the legal exposition in the dissent; it is just that the dissent is based on the fact that Goodwin must have been testifying as an expert with respect to the facts in question when we think the record reveals otherwise.

cile bank accounts. His use of inquiries of the clerks themselves to verify his reconciliation is an appropriate and recognized procedure. The District Court thus acted properly in receiving the exhibits in evidence, deferring any final action until the defendant had had an opportunity to cross-examine. If the defendant wished to review with the expert witness the various checks or any of them, that opportunity was available to him on cross-examination. It would have been an easy matter for the defendant to have had the witness go through each check received by any clerk during the five days in question. The fact that he did not pursue the subject in cross-examination is compelling evidence that he accepted the accuracy of the expert witness' verification of the checks which had been included in the clerks' deposits on the five critical days, and did not wish to cross-examine the witness on that point. Moreover, it must be remembered that all the clerks were witnesses, available for cross-examination by the defendant. The exhibits thus carried the clearest indicia of reliability and accuracy and were admissible in evidence. The defendant, in cross-examination, developed nothing that detracted in the slightest from a finding of such accuracy and reliability. The admission of the exhibits by the District Court was plainly authorized under the Federal Rules of Evidence, as identified above.

Since there was no error in the admission into evidence of the exhibits prepared by the postal inspector, the judgment of conviction in my opinion should be affirmed, and I accordingly dissent from the reversal of such conviction.